## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Linda Lewis, individually, and as Trustee
For the Next-of-Kin of Jamie Joseph Lewis,

      Plaintiff,

vs.

City of Burnsville, a municipal corporation, and
Steven Stoler, Brett Levin, Michelle
Frascone, and John Smith, all in their official and
individual capacities,

      Defendants.

Civil Action No.: 19-cv-1117

## COMPLAINT
## JURY TRIAL DEMANDED

By and for her Complaint against the above-named Defendants, Plaintiff Linda Lewis pleads as follows:

### INTRODUCTION

1. The night of September 26, 2016, C.A.H. called 911 to ask the police for help with her ex-boyfriend Jamie Joseph Lewis, who had told her that he was going to shoot himself. Just over an hour later he was dead—shot in the back by SWAT-trained officers with scoped rifles.

2. The immediate use of deadly force by officers responding to the call for help for a suicidal citizen, instead of making any attempt to help Mr. Lewis while he was in the midst of a medical crisis, violated Mr. Lewis's Fourth and Fourteenth

Amendment rights. Moreover, these violations and the death of Mr. Lewis were caused by Defendant City of Burnsville's failure to properly train its officers in responding to medical crises.

## PARTIES

3. Linda Lewis is the mother of Jamie Lewis and is duly-appointed Trustee for the Next of Kin of Jamie Lewis.

4. Defendant City of Burnsville is a municipal corporation located in the State of Minnesota.

5. On information and belief, Defendants Steven Stoler and Brett Levin are residents of the State of Minnesota and are police officers employed by the City of Burnsville Police Department, and acted under color of law in the actions complained of. Defendants are sued in their individual and official capacities.

6. On information and belief, Defendant Michelle Frascone is employed by the Minnesota Bureau of Criminal Apprehension, and is a resident of the State of Minnesota. Defendant is sued in her individual and official capacities.

7. Defendant John Smith is an officer employed by the Burnsville Police Department or an employee of the Bureau of Criminal Apprehension, whose identity is currently unknown. Defendant is sued in his individual and official capacities.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's claims under 42 U.S.C. § 1981 and § 1983, and under 28 U.S.C. § 1343 and § 1367.

9. Venue is proper in this district under 28 U.S.C. § 1391, as the acts and omissions complained of occurred in the District of Minnesota.

**FACTUAL BASIS**

10. On May 29, 2017, the Dakota County Attorney's Office released its report on the investigation into the shooting death of Jamie Joseph Lewis by police. In the report, the office cleared the officers of wrongdoing, stating that the responding officers, including the single officer who shot Mr. Lewis in the back, had done so in self-defense. The facts, however, tell a different story.

<u>The Background</u>

11. In the week leading up to the shooting, Mr. Lewis had lost his girlfriend and then his job within a period of just a few days. He had been struggling with depression for some time, but without health insurance, was unable to regularly take his prescription medication; the combination of factors set off a medical mental health crisis in Mr. Lewis that culminated on September 26, 2016.

12. Mr. Lewis became despondent, and on September 26, 2016 he went to the apartment of his ex-girlfriend C.A.H.

13. Mr. Lewis had been making suicidal comments for days, but spent several hours with C.A.H. that afternoon discussing their recently-ended relationship. Towards the end of the evening, Mr. Lewis pointed C.A.H. towards a letter—a suicide note, although she did not know it at the time—that he had written and left for her several days before, when they had broken up. C.A.H. had not yet read the letter.

14. Mr. Lewis stated that he had no options left; and, referring to a handgun he was carrying, stated that he if he was caught with it he would go to prison for ten years—and that he wasn't going to prison. Although he had been convicted of nothing more serious than a traffic violation in more than 20 years, Mr. Lewis was a felon prohibited from possessing a firearm.

15. Mr. Lewis then opened up several beer bottles, spilling one in the process, and left the apartment, taking a handgun with him. According to C.A.H., Mr. Lewis said he did not want his son to find him, and told C.A.H. not to tell anyone. It was just after 10:00 p.m. on the evening of September 26th, 2016.

## The Police Response

16. Trying to save his life, C.A.H. called 911, and reported that Mr. Lewis had just left her apartment with the intention of killing himself. C.A.H. faithfully reported Mr. Lewis's description and the relevant facts, including that he had a firearm and did not want to go back to prison.

17. More than a dozen Burnsville police officers responded to the call, including Defendants Stoler and Levin. For more than an hour, officers searched the scene, including inside the apartment building at 1605 Cliff Road, Burnsville, Minnesota, and the surrounding area.

18. 1605 Cliff Road is a large apartment complex, surrounded by a parking lot, trees, and tall grass. It is bounded on the north by Cliff Road; to the west are two small commercial buildings, accessible on foot.

19. During the course of their search, officers secured the entrance of the apartment complex, to ensure that civilians did not leave while the search was going on. They also went to the nearby commercial buildings, to ensure that any visitors or employees were aware of the situation and would remain secure inside until the area was clear. Officers located and searched Mr. Lewis's car, still in the parking lot, using a ballistic shield for cover. At the time of the shooting, officers had effectively secured the scene and ensured that no civilians were unaccounted for in the area.

20. Having not found Mr. Lewis on the grounds of the apartment complex, officers requested air support from the Minnesota State Patrol. On information and belief, Defendant Sergeant Stoler was the highest-ranking officer on the scene and requested air support.

21. Although officers were on-scene for more than an hour and had an opportunity to call for air support, at no time did officers request a mental health crisis team or anyone else whose primary task was dealing with mental health crises.

22. After several more minutes, a helicopter from the Minnesota State Patrol arrived on-scene, equipped with an infrared camera. The helicopter quickly located a heat signature to the west of the complex, noting that the signature was coming from an area to the west side of the complex, past the trees. The heat signature indicated a person lying prone on the ground. The State Patrol relayed this information to the officers on the ground. Ninety seconds later, Mr. Lewis was dead.

## The Notice and Training

23. The Burnsville Police Department has responded to over 500 mental health crisis calls every year since 2016. The City has experienced nearly a 400% growth in crisis related calls in the last ten years, and the police department recognizes that mental health calls need to be addressed by all of its officers.

24. Given the number of crisis calls to which the Burnsville Police Department responds every year, the need to train officers not to automatically shoot anyone engaged in a mental health crisis was obvious.

25. Defendant City of Burnsville had also been put on notice of the need to properly train its officers by a strikingly similar incident that had happened six months before.

26. On March 17, 2016, police had previously shot in the back and killed a man in the midst of a similar mental health crisis.

27. In the course of that incident, Burnsville Police had responded to the scene of a man armed with a knife who had been reported to be behaving strangely while inside his car parked in a McDonald's parking lot.

28. In that incident, as in this one, when police responded the man appeared unresponsive to police commands to drop his weapon.

29. In that incident, as in this one, police escalated the situation, in that case by breaking the man's window and tazing him while he posed no threat to other people in the area.

30. In that incident, as in this one, officers acted excessively and unreasonably when faced with a man in the midst of a mental health crisis. Having tazed the man and seeing him try to avoid the officers' excessive use of force, Burnsville police officers, on information and belief following their training by Defendant City of Burnsville, shot the man in the back and killed him. A key difference between the two incidents is that in the previous incident, the man was fleeing police; in this incident, Mr. Lewis was on the ground not moving when they shot him.

31. Defendant Sergeant Stoler's police record and actions on the day in question reveal that Defendant City of Burnsville did not provide the necessary training to its officers. Defendant Sergeant Stoler served with the Burnsville Police, and had regularly attended the training programs implemented by the Burnsville Police Department, including S.W.A.T. training. By contrast, he had just once attended one session of mental health training.

32. Defendant Officer Levin's training records are currently unavailable. On information and belief, Defendant Officer Levin's training was not substantially better than Sergeant Stoler's in peacefully resolving mental health crises.

33. Defendant officers reacted according to the training they had received from Defendant City of Burnsville. What happened next on September 26th was, in substantial part, caused by the insufficient training by Defendant City of Burnsville regarding mental health crises.

The Shooting

34. On information and belief, Mr. Lewis had never left the area of the apartment complex. During the entire police search, he was within visual range of the complex, yet sat or lay in the grass, with a handgun next to him, drinking a beer. At no time during this hour-long time period (as reported by the released results of the investigation) did Mr. Lewis commit any violent crimes or acts, threats of violence, or even encounter any other individuals.

35. On hearing his possible location, Defendants Sergeant Stoler and Officer Levin went to the location. They drove their vehicle close to Mr. Lewis and dismounted their vehicles, and immediately took out their scoped rifles.

36. At the time the officers approached him, Mr. Lewis was posing no threat to anyone other than himself, and no one other than officers was outside in the area.

37. The officers had a ballistic shield available on-scene, the purpose of which is to protect an officer from gunshots. An officer requested that the shield be brought up, but the officers did not wait for it to arrive. Each officer was also equipped with, and was wearing, a bulletproof vest.

38. Despite this, the officers approached within engagement range of the weapon sitting next to Mr. Lewis. The officers were carrying rifles with a maximum effective range against a point target of 300 meters. Mr. Lewis had a handgun next to him, which had a maximum effective range of only 50 meters.

39. Nevertheless, having heard that at most Mr. Lewis had a handgun, the officers approached to within 40 meters of Mr. Lewis, and shined a bright spotlight on him.

40. Mr. Lewis remained lying on his back, drinking his beer for a few seconds. He did not respond to Defendants' shouting at him. He did not attempt to evade arrest and at no point did he point any object in the direction of the officers. He had, in fact, not moved from his position for a significant period of time.

41. Knowing that Mr. Lewis may have intended "suicide by cop," Defendants nevertheless continued aggressively shouting at him, identifying themselves as police. Mr. Lewis continued not to respond.

42. Defendant Stoler mistakenly identified the beer Mr. Lewis was drinking as a weapon, and determined that Mr. Lewis was pointing it at them and that the officers were in danger. He fired his rifle several times, striking Mr. Lewis. Mr. Lewis rolled over onto his stomach, dying. Defendant Levin did not fire his weapon.

43. Despite the fact that a Minnesota State Patrol helicopter with an infrared camera was on-scene which had and could clearly identify Mr. Lewis's location, Defendant Sergeant Stoler reported that he was worried at this point that the wounded Mr. Lewis might crawl away and disappear. So Defendant Sergeant Stoler continued to fire round after round; his rounds hit Mr. Lewis in the back side of his body. It is not clear which round or rounds exited through Mr. Lewis's chest, killing him. At no point did any other officer fire.

44. Having taken only ninety seconds from the initial location call to shooting Mr. Lewis in the back, Defendants then took their time approaching him to arrest or render aid. They waited for the ballistic shield to arrive before other officers approached Mr. Lewis and handcuffed him approximately six minutes later. Both

the bottle, now empty, and the handgun, still full, were found next to Mr. Lewis. He was pronounced dead at the scene.

## The Aftermath

45. After the scene was secured, Defendants turned in their weapons and reported for post-incident testing and questioning. Investigators took statements from involved officers, and on information and belief, both investigators and attorneys spoke to Defendants before their statements were given.

46. In addition, Defendant Sergeant Stoler was given an opportunity by Defendant John Smith to review the body camera footage before he gave his statement. Defendant Sergeant Stoler was therefore able to determine what statements would be supported or contradicted by video evidence before giving his statement.

47. During the investigation process, Defendant Officer Levin was interviewed by Defendant Michelle Frascone and Brent Peterson of the Bureau of Criminal Apprehension.

48. During the interview, Defendant Officer Levin reported the information he had received prior to the shooting, including that Mr. Lewis may have intended to take his own life.

49. Hearing this statement that Mr. Lewis may have intended to harm himself, Defendant Frascone suggested to Defendant Officer Levin that Mr. Lewis's intent may have been not merely to end his own life, but to murder other people as well. No other information available to any police or investigators at that time, including Defendants, suggested this.

50. At Defendant Frascone's prompting, Defendant Officer Levin adopted this revised statement as his own, and made it part of his official report on the incident.

51. On information and belief, the BCA interviewed other officers involved in the shooting and had an opportunity to talk to those officers as part of that investigation.

## The Justification

52. Defendant Officer Levin's adopted statement, and the statements of other involved officers, were used as part of the justification for clearing the officers of the shooting. The Dakota County Attorney's Office used as part of its basis for defending the officers that Mr. Lewis "remained an immediate threat to officers *and others*." No information provided to police, except for the unsupported conclusion Defendant Frascone recommended Defendant Officer Levin make as part of his official statement, indicated that Mr. Lewis posed a threat to others.

53. The Dakota County Sheriff's Office also used as justification for officers shooting Mr. Lewis in the back that he had been diagnosed with depression.

54. Based in part on Defendant Frascone's recommendation to Defendant Levin that he report that he feared Mr. Lewis would murder other people and that police were therefore justified in shooting him in the back and on Mr. Lewis's diagnosis of depression, officers involved were cleared in Mr. Lewis's shooting, and no charges were ever filed.

55. On information and belief, this action engaged in by Defendant Frascone, Defendant Smith, and adopted by Defendant Officer Levin and possibly other Defendants, was intended to obstruct the proper course of the investigation, to clear officers of

11

wrongdoing, and to ensure that Defendants were not held liable for the death of Mr. Lewis.

56. By the actions complained of above, Plaintiff has been harmed, both in the wrongful death of her son and the loss of his companionship and support, as well as her ability to seek justice in the courts for his death.

### Count I: Violation of 42 U.S.C. § 1983 (Unreasonable Seizure)
### Against Defendants City of Burnsville and Stoler

57. Plaintiff restates and realleges every paragraph above as if fully set forth herein.

58. By the actions complained of Defendants, acting under color of law, unreasonably seized Mr. Lewis by the excessive and unreasonable use of force, violating his rights under the Fourth Amendment and Fourteenth Amendment.

59. The right of an individual to be free from excessive use of force by police officers had been clearly established on September 26, 2016.

60. As a result of Defendants' unreasonable used of force, Mr. Lewis was shot and killed.

61. As a direct and proximate result of these actions of Defendants complained of above, Plaintiff was injured by the wrongful death of her son.

### Count II: Violation of 42 U.S.C. § 1985 (Conspiracy)
### Against All Defendants

62. Plaintiff restates and realleges every paragraph above as if fully set forth herein.

63. By the actions complained of above, Defendants, acting under color of law, conspired together to obstruct justice by means including, but not limited to, reporting in the official statement unsupported or incorrect facts, which would tend

to increase the likelihood of a finding that the shooting was justified and decrease the likelihood that Defendants would be found liable for Mr. Lewis's death.

64. These actions were taken to influence the verdict, presentment, or indictment of any grand or petit juror who might consider the criminal or civil liability of Defendants for their actions complained of above.

65. As a direct and proximate result of these actions of Defendants complained of above, Plaintiff was injured by the hindrance of the ability to seek justice in the courts for criminal or civil liability.

### Count III: Negligence
### Against Defendants City of Burnsville, Stoler, and Levin

66. Plaintiff restates and realleges every paragraph above as if fully set forth herein.

67. On information and belief, Defendants had a duty under both written and unwritten policies of the City of Burnsville Police Department to exercise restraint when dealing with individuals in the midst of a mental health crisis. These policies direct the duties of responding offers as follows:

    a. Written City of Burnsville policies regarding the use of deadly force specifically direct officers to consider the conduct of the individual being confronted, the effect of alcohol on the individual, the individual's mental state or capacity, the reason for contact with the individual, and the apparent need for immediate control of the individual or a prompt resolution of the situation, and the availability of other options and their possible effectiveness.

    b.    Related to this last point, written City of Burnsville policies regarding first responders responding to potential mental health emergencies should first assess the situation to determine whether a mental health crisis may be a factor, request specialized resources, use conflict resolution and de-escalation techniques when responding to a person in crisis, to avoid using bright lights if possible, take into account the person's mental and emotional state and potential inability to understand commands or appreciate the consequences of his/her action or inaction, determine the cause of motivation for the person's actions or stated intentions, and if possible, use alternatives to force.

    c.    The City of Burnsville's written policies inform officers that a Crisis Intervention Team is available to deal with a person in crisis. The policy specifically directs that in that situation, the Crisis Intervention Team member shall be the lead officer on the scene.

    d.    The City of Burnsville's written policies also specifically direct officers to consider taking no action or passively monitoring a situation.

68. By the actions complained of above, Defendants breached those duties.

69. As a direct and proximate result of these actions of Defendants complained of above, Plaintiff was injured by the wrongful death of her son.

70. Defendant City of Burnsville is vicariously liable for the negligence of individual officers who responded to the situation and acted within the course and scope of their employment with Defendant City of Burnsville.

### Count IV: Negligence
### Against Defendant City of Burnsville

71. Plaintiff restates and realleges every paragraph above as if fully set forth herein.

72. Defendant City of Burnsville had a duty to train its police officers to follow the City's policies as laid out in Count III above, and to train its police officers how to respond to mental health crises without violating the Fourth and Fourteenth Amendment rights of citizens.

73. Defendant City of Burnsville breached its duty by failing to properly train Defendant officers, which it employed.

74. As a direct and proximate result of these actions of Defendant complained of above, Plaintiff was injured by the wrongful death of her son.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court issue an order:

1. Entering a monetary judgment in favor of Plaintiff and against Defendants in the amount of $1,500,000;

2. Issuing injunctive relief, and ordering Defendant City of Burnsville to engage in proper training of its officers;

3. Allowing Plaintiff to amend its complaint to add a claim for punitive damages, when allowed by statute;

4. Entering an award of costs, expenses, and attorney's fees as required by 42 U.S.C. § 1988; and

5. Such other relief as this Court will find just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Dated:  April 25, 2019.                    HANSEN, DORDELL, BRADT, ODLAUG
                                                                    &BRADT, P.L.L.P.


                                                                    By  s/ Michael Kemp
                                                                        MICHAEL KEMP                     #390426
                                                                  Attorneys for Plaintiff
                                                                  3900 Northwoods Drive, Suite 250
                                                                St. Paul, MN  55112-6973
                                                                651/332-8734
                                                                mkemp@hansendordell.com