## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Lewis, *individually, and as Trustee For the Next-of-Kin of Jamie Joseph Lewis*, | File No. 19-cv-01117 (ECT/JFD) |
| Plaintiff, | |
| v. | |
| | **OPINION AND ORDER** |
| City of Burnsville, *a municipal corporation*, Steven Stoler, *all in their official and individual capacities*, Brett Levin, *all in their official and individual capacities*, and John Smith, *all in their official and individual capacities*, | |
| Defendants. | |

Michael Kemp, Aaron Ferguson Law, Roseville, MN, for Plaintiff Linda Lewis.

Vicki A. Hruby and Joseph E. Flynn, Jardine Logan & O'Brien PLLP, Lake Elmo, MN, for Defendants City of Burnsville, Steven Stoler, and Brett Levin.

Plaintiff Linda Lewis is the mother of Jamie Lewis and is the appointed Trustee for Jamie's next of kin. She filed this case in April 2019, after police officers employed by the City of Burnsville shot and killed Jamie while he was in the midst of a mental-health crisis. She asserts § 1983 and state-law negligence claims against the City of Burnsville and responding officers Steven Stoler and Brett Levin. Defendants seek summary judgment, and their motion will be granted. The undisputed facts show that officers reasonably believed that Jamie had pointed a loaded firearm at them. Police officers did not violate Jamie's constitutional rights when they shot him. If that were incorrect, there

is no reasonable dispute that officers did not violate a clearly established right of Jamie's. Linda's state-law claims are barred by official immunity under Minnesota law. The disposition of Defendants' summary-judgment motion makes it unnecessary to address motions to exclude expert testimony filed by both Linda and Defendants.

## I[1]

On September 26, 2016, C.H. called 911 at 8:22 p.m. to report that her boyfriend, Jamie, had left her apartment on Cliff Road in Burnsville, Minnesota, about five minutes earlier on foot; was "planning on killing himself"; had "been planning this for days"; had some kind of "smaller" gun and "a bunch of bullets"; and had consumed a beer and "a bunch of NoDoz." Hruby Decl. Ex. 1 ("911 Audio") [ECF No. 85-1] at 0:03–4:30; Hruby Decl. Ex. 4 (Burnsville police computer-aided dispatch ("CAD")) [ECF No. 85-4 at 13–14]; *see also* Hruby Decl. Ex. 2 ("C.H. Dep.") [ECF No. 85-2 at 2, 4, 7]; Hruby Decl. Ex. 20 ("C.H. Interview") [ECF No. 85-10 at 19].[2] C.H. and Jamie had recently broken up, and Jamie, who had depression, had been upset for the last several days and quit his job. CAD at 10; C.H. Dep. at 6; 911 Audio at 4:35–4:41, 5:44–5:50, 8:06–8:25, 8:44–9:15; C.H. Interview at 15. C.H. also reported:

> That if I called the cops, that he'll make sure he goes out good, 'cause he is planning on not coming back, no matter what. He does not want to live. I was even afraid to call you guys 'cause if anyone tries to find him, he'll do it, he'll do something stupid. But I totally believe him.

---

[1] Unless otherwise noted, the facts are undisputed or described in a light most favorable to Lewis. Fed. R. Civ. P. 56(a).

[2] All citations to page numbers of documents attached to the Hruby Declaration [ECF No. 85] are to the ECF pagination.

911 Audio at 5:17–5:43.  The 911 operator asked, "Do you think he'll be violent towards police when they find him?" and C.H. responded:

> He's a convicted felon that—from a hundred years ago, he's marked, yeah.  He's not gonna go back to prison.  He already made that clear.  He's not a violent person, but he made it clear he's going to kill himself and, if the cops try to stop him, it's not going to work, 'cause he's not going to prison for having a gun.

911 Audio at 7:19-7:49; *see also* C.H. Dep. at 4–5.  C.H. got off the 911 call when officers arrived at her apartment.  911 Audio at 9:29–9:54.

This information was relayed to officers.  *See* Hruby Decl. Ex. 3 ("Dispatch Audio") [ECF No. 85-3] at 0:05–0:36 (relaying that a male, shortly identified as Jamie Lewis, was on foot "with a gun and bullets, said he's gonna go kill himself"; drank a beer and took some NoDoz; left five minutes ago; and had said he'd been "planning this for days," among other details); *id.* at 2:05–2:17 (relaying report that suspect is "a convicted felon and he said that he wasn't going to go back to prison, he's not violent, but that he made it clear the cops couldn't stop him"); CAD at 10, 13–14; Hruby Decl. Ex. 5 ("Stoler Dep.") [ECF No. 85-4 at 29, 34]; Hruby Decl. Ex. 6 ("Levin Dep.") [ECF No. 85-4 at 65–66].

C.H. provided further information to the officers who came to her apartment, saying that Jamie had severe depression, that he had said he did not want to be caught by law enforcement, and that officers should be careful approaching Jamie because he would not be cooperative.  C.H. Interview at 15–19; C.H. Dep. at 5, 8; Hruby Decl. Ex. 8 ("Police Report") [ECF No. 85-4 at 74–75, 79].  C.H. showed officers a box of bullets that was

partly empty and said Jamie had loaded some bullets into a gun before he left.  C.H. Dep. at 5, 8; C.H. Interview 17–18.  She also provided a photo of Jamie.  Police Report at 79.

These details, and the photo, also were relayed to officers.  Dispatch Audio at 4:21–4:39, 7:04–7:17; CAD at 6; Stoler Dep. at 32 ("We had gotten further information from the officers on the scene from Mr. Lewis's girlfriend that he had left with the gun and the ammunition, that he was a convicted felon, wasn't going back to prison and was going down fighting."); *id.* at 34 (similar); *id.* 39–40 (reviewing information Stoler had received); Levin Dep. at 65–66; Police Report at 79; Hruby Decl. Ex. 10 ("Carlson BCA Interview") [ECF No. 85-5 at 9]; Hruby Decl. Ex. 17 ("Nacey BCA Interview") [ECF No. 85-10 at 2].

Numerous officers responded to the situation and began searching for Jamie.  *E.g.*, Dispatch Audio at 3:13–3:42, 5:26–5:43 (communications among officers regarding how to search and places searched); Stoler Dep. at 30; Levin Dep. at 59; Carlson BCA Interview at 9; Nacey BCA Interview at 2.  Relevant here, Stoler was the Patrol Sergeant on duty and served as incident commander.  Stoler Dep. at 29, 33; Levin Dep. at 59.  And Levin heard the call on his squad car radio and joined the search.  Hruby Decl. Ex. 11 ("Levin BCA Interview") [ECF No. 85-5 at 12].  Officers were searching "a wide-ranging area," and Stoler eventually called in a helicopter equipped with a forward-looking infrared ("FLIR") camera to look for heat signatures.  Dispatch Audio 9:02–9:06, 20:43–20:55; Stoler Dep. at 33, 35, 36.  Officers, including Stoler and Levin, had concerns about foot traffic and other activity of the public and worked to clear people from the area.  *See* Dispatch Audio 6:48–6:56; Stoler Dep. at 33, 37, 49; Levin Dep. at 60.

The FLIR operator in the helicopter located a "hot spot"—a heat signature—and directed Stoler and Levin to it because their squad cars were nearby. Dispatch Audio at 20:58–21:44; Stoler Dep. at 38; Levin Dep. at 62; Hruby Decl. Ex. 13 ("FLIR Video") [ECF No. 85-6] at 00:00–00:48. As they arrived, they were told that the hot spot was "proned out," then moments later that it was moving and was a person. Dispatch Audio at 21:45–21:59; FLIR Video at 00:48–01:18.

Based on the information they had been provided, Stoler and Levin each believed Jamie was a threat to officers and the public. According to Stoler,

> Key information that a male had left the apartment with a .45 caliber handgun and bullets and that he was suicidal. The fact that he bought bullets plural is abnormal for somebody that wants to commit suicide. You only need one bullet. There was information that he had been drinking and took NoDoz, that he was a convicted felon, was not going to go back to prison and he would go down fighting if he was caught with a gun. Based on all that, I determined him to be a significant threat to the public and officers.

Stoler Dep. at 39–40; *see also id.* at 40 (Stoler's view of Jamie's potential for violence and whether Jamie was a threat to officers or the public); *id.* at 42. According to Levin,

> It was my belief at that time he was reported to be suicidal, but the fact that he had made an actual statement to her that he wasn't going to go down without a fight and he wasn't going to go back to jail, the fact that he had a handgun with actual bullets led me to believe he also was homicidal or could be homicidal as well.

Levin Dep. at 65–66; *see also id.* at 69.

Stoler and Levin, who were in uniform, exited their squad cars near the hot spot. Stoler Dep. at 43, 44; Levin Dep. at 63–64; Levin BCA Interview at 14; Hruby Decl. Ex.

12 ("Stoler BCA Interview") [ECF No. 85-5 at 20]; Hruby Decl. Ex. 14 ("Levin Body Cam") [ECF No. 85-7] at 00:00–00:10; Hruby Decl. Ex. 15 ("Stoler Body Cam") [ECF No. 85-8] at 00:00–00:03.  Levin turned on his spotlight and directed it to the hot spot, and Stoler positioned himself behind Levin's car, near the driver's door, such that he was standing to Levin's right.  Stoler Dep. at 44, 48; Levin Dep. at 64; Levin BCA Interview at 14; Levin Body Cam at 00:11–00:18; Stoler Body Cam at 00:04–00:13.  Stoler "immediately saw him with a handgun. . . .  It was very clear, it was a silver colored handgun."  Stoler Dep. at 46; *see also id.* at 45 (describing being "focused on the weapon" which "was clearly a handgun," "silver in color"); Levin Dep. at 67 ("I can confirm that I observed -- during the incident I observed a silver/gray handgun.").  Stoler announced that the person had a gun.  Dispatch Audio at 22:00–22:03; Stoler Dep. at 44 (Stoler communicated to others, "[o]ne at gunpoint, person has a gun"); *id.* at 46 (confirming same); Levin Dep. at 64; FLIR Video at 01:18–01:27 (radio stating, "one at gunpoint, he's got a gun in his hand"); Levin Body Cam at 00:40–00:42.

Stoler and Officer Levin both had their rifles out.  Stoler Dep. at 48; Levin Dep. at 68; Levin Body Cam at 00:18; Stoler Body Cam at 00:10–00:13.  Over the course of about twenty-five to thirty seconds, they told Jamie (Stoler and Levin did not yet know his identity) twice that they were police, three times to keep his hands in the air, and seven times to drop his gun, but he did not put his hands in the air or put down his gun.  Stoler Dep. at 47, 48; Levin Dep. at 68; Carlson BCA Interview at 10; Levin Body Cam at 00:30–00:57; Stoler Body Cam at 00:29–00:40.  While this was happening, Jamie brought

the gun to his head, then down to his side, repeating this movement several times.  FLIR Video at 01:21–01:36; Stoler Dep. at 46; Stoler BCA Interview at 20.

Then, according to Stoler and Levin, Jamie sat up and pointed a gun at them.  Stoler Dep. at 47 ("Mr. Lewis then eventually sat up and pointed it directly towards me and my partner."); *id.* (stating three more times gun was pointed at him and that "[i]t was like I was looking down the barrel of that gun"); Levin Dep. at 69 ("What I saw was an individual laying on the ground.  He had a gun in his hand and he had pointed the gun at us, and then that's when I heard the shots."); *id.* ("He was leaning forward with a gun out and his right hand extended at us on the ground.  . . .  [He was] pointing the gun in our direction."); Levin BCA Interview at 15 ("I looked through my um, my, optic of my riffle [sic] and saw that, that was a handgun in his hand and that's when things kinda got, this is, this is for real.  He's gonna kill me.  . . .  [T]hat's when ah, I heard the snap of a, Sergeant Stoler's rifle."); Stoler BCA Interview at 20 ("[I]t seemed clear as day he sat up, turned and pointed it directly towards me.  . . .  I immediately thought he was gonna shoot me.").

Stoler fired.  Stoler BCA Interview at 20 ("[A]s soon as that gun pointed at me um I pulled the trigger."); Levin Body Cam at 00:57–01:07; Stoler Body Cam at 00:38–00:48. Stoler "couldn't tell if [his] rounds were having any impact or any effect on him."  Stoler Dep. at 47.  Stoler thought Jamie "looked like he was rolling towards some high weeds"; Stoler did not know if he had hit Jamie, did not want him to get into an area with people around, and "just wanted him to stop from doing what he was doing and drop the gun."  *Id.* Stoler fired seven rounds.  *Id.*; Levin Body Cam at 00:57–01:07; Stoler Body Cam at 00:38–00:48.  Other officers arrived as Stoler was firing, and Stoler told them that Jamie

had pointed a gun at Levin and him.  Carlson BCA Interview at 9–10; Levin Body Cam at 01:14–01:20; Stoler Body Cam at 00:55–01:01, 01:29–01:30.

Other officers approached Jamie; one of them said that "there was still some movement" as they created their approach team, and then, as they began making their approach, Jamie "wasn't[] listening to commands or moving at that point."  Nacey BCA Interview at 2; *see also* Stoler Dep. at 49; Carlson BCA Interview at 9.  A silver handgun was near Jamie's shoulder.  Nacey BCA Interview at 2, 3; Hruby Decl. Ex. 18 ("Crime Scene Team Report") [ECF No. 85-10 at 7].  A beer bottle "was lying slightly on top of" the gun.  Crime Scene Team Report at 5, 7; *see* Kemp Decl. Ex. D [ECF No. 110 at 45].  Stoler and Levin both said they did not see a beer bottle in Jamie's hand.  Stoler Dep. at 45; Levin Dep. at 68.  The officers approaching Jamie reached him, other officers arrived, and first aid was started, but Jamie was pronounced dead at 9:29 p.m., having sustained three gunshot wounds.  Carlson BCA Interview at 9; Nacey BCA Interview at 2–3; Hruby Decl. Ex. 21 (autopsy) [ECF No. 86].

Linda asserts five counts in the Complaint: Violation of 42 U.S.C. § 1983 (Unreasonable Seizure) against the City and Stoler; Violation of 42 U.S.C. § 1985 (Conspiracy) against all Defendants; negligence against the City, Stoler, and Levin; and negligence against the City.  Compl. [ECF No. 1] ¶¶ 57–74.  The individual defendants are sued in both their official and individual capacities.  *Id.* ¶ 5.  Another defendant, Michelle Frascone, was previously dismissed.  ECF No. 34.  Defendants argue, Mem. Supp. [ECF No. 84] at 31–33, and Linda concedes, Mem. Opp'n [ECF No. 108] at 31, that the

conspiracy claim, Count II, must be dismissed for the reasons articulated in the order dismissing Frascone.  *See* ECF No. 34 at 11–12.[3]

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

## A

Start with the § 1983 unreasonable-seizure claim in Count I to the extent it is asserted against Stoler in his individual capacity.  In determining whether individual officers have qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right

---

[3]    Although no party commented on it, this also disposes of any claim against defendant John Smith, whose identity was unknown, as the only claim against him was the conspiracy count.  Compl. ¶¶ 7, 62–65.  And in any event, "if 'after the completion of discovery, Plaintiffs have not ascertained the identity of or established any facts regarding . . . unnamed Defendants,' dismissal is proper."  *Larson v. Lake*, No. 17-cv-3551 (NEB/ECW), 2019 WL 5150832, at *19 (D. Minn. June 10, 2019) (quoting *Gold Star Taxi & Transp. Serv. v. Mall of Am. Co.*, 987 F. Supp. 741, 753 (D. Minn. 1997)), *report and recommendation adopted as modified sub nom. Larson v. Carlton Cnty. Jail*, 2019 WL 4187839 (D. Minn. Sept. 4, 2019), *aff'd*, 810 F. App'x 489 (8th Cir. 2020).

was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts, in their sound discretion, may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)), *cert. denied sub nom. Kong v. City of Burnsville, Minn.*, 141 S. Ct. 2839 (2021).

The constitutional right at issue here is Jamie's Fourth Amendment right to be free from unreasonable seizure. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (holding "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment").[4] Determining whether excessive force was used "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kong*, 960 F.3d at 991 (cleaned up) (quoting *Kisela*, 138 S. Ct. at

---

[4] The complaint also references the Fourteenth Amendment. *See* Compl. ¶¶ 2, 58, 72 (introductory paragraph; Count I stating, "Defendants, acting under color of law, unreasonably seized Mr. Lewis by the excessive and unreasonable use of force, violating his rights under the Fourth Amendment and Fourteenth Amendment"; and paragraph in Count IV). Defendants argue that "to the extent Plaintiff's Complaint can be read to assert a Fourteenth Amendment claim, there is no settled Fourth or Fourteenth Amendment principle mandating mental health care for a [person in Jamie's circumstances], who was not yet seized. In fact, the opposite is true." Mem. Supp. at 29 (footnote omitted) (citing cases). Linda did not respond to this argument. To the extent a Fourteenth Amendment claim is being made, it is either waived or fails as a matter of law.

1152).  "Reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" and must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* (quoting *Kisela*, 138 S. Ct. at 1152). "[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Id.* (quoting *Garner*, 471 U.S. at 11).

Here, the undisputed material facts establish as a matter of law that there was no violation of Jamie's Fourth Amendment right to be free from unreasonable seizure.  Before they located Jamie, Stoler and other officers knew that Jamie was armed, that he had made it clear he would not be stopped by police, and that he said he would go down fighting. After locating Jamie, Stoler knew Jamie had a gun in his hand and, after some seconds, that Jamie was not complying with officers' orders to put the gun down or otherwise responding to them.  Then, Stoler observed Jamie sit up and point the firearm at him and Levin.

These facts are like those in *Rogers v. King*, 885 F.3d 1118 (8th Cir. 2018):

> Viewing the evidence in the light most favorable to Rogers and Boyd, and considering the totality of the circumstances, we conclude that Officer King's use of deadly force was objectively reasonable.  The officers responded to Ambrose-Boyd's home after receiving a 911 call report that she was home alone, suicidal, and had a gun.  The dangerousness of the situation escalated as the officers found themselves in a hallway with Ambrose-Boyd holding a gun.  Ambrose-Boyd failed to respond to commands to drop the weapon.  The

11

> officers testified that her mental state added to their fears and
> that she raised the gun to Officer Christoph's shin level.  At
> that time "a reasonable officer would have had probable cause
> to believe that [she] posed a threat of serious physical harm,
> and any mistake in believing that [s]he posed such a threat was
> objectively reasonable."  *Partlow*, 774 F.3d at 503.  There is
> "no constitutional or statutory right" that prevents an "officer
> from using deadly force when faced with an apparently loaded
> weapon."

*Id.* at 1121–22.  Under the similar circumstances here—a suicidal person with a gun who failed to drop the gun when ordered and pointed the gun at an officer—the use of deadly force was reasonable.

Linda tries to make this case more complicated than that, but it just isn't.  Linda distinguishes between when the decision was made to seize Jamie and when the seizure-by-shooting occurred, *see* Mem. Opp'n at 15–16, in service of arguing that Stoler decided to use deadly force at some point well in advance of firing the shots, *id.* at 16 ("Defendants decided to affect a seizure of Mr. Lewis . . . by moving in to start surrounding him.  It is this decision to use deadly force to seize Mr. Lewis, . . . which is the decision this Court must analyze for 'objective reasonableness.'"); *id.* at 22 ("[T]his Court must determine whether . . . it was objectively reasonable for police to decide in advance to approach and then kill Mr. Lewis.").  But Linda identifies no evidence suggesting that Stoler (or anyone else) decided to use deadly force at some point before the deadly encounter actually occurred or that Jamie's shooting was inevitable.

Linda asserts "that the officers believed Mr. Lewis would attempt 'suicide by cop' or 'go down fighting['] if they approached[,]" *id.* at 20, and argues that this fact means "this case is most analogous not to 'split-second' police shootings," but to "police

roadblock cases," exemplified by *Brower v. County of Inyo*, 489 U.S. 593 (1989), *id.* But *Brower* only decided whether a seizure for Fourth Amendment purposes had been sufficiently alleged and, having concluded it had, remanded to the appellate court to consider whether the district court's dismissal on the basis that the seizure was not unreasonable was appropriate. *Brower*, 489 U.S. at 599–600. *Brower* only discussed reasonableness to clarify that the decision on seizure did not mean "that the precise character of the roadblock is irrelevant to further issues in this case," namely reasonableness. *Id.* at 599. Linda does not discuss any other "police roadblock case." Cases in the Eighth Circuit that discuss the reasonableness of police creating a situation in which deadly force becomes justified come out contrary to Linda's theory, *see Kong*, 960 F.3d at 993–94 (quoting *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995)) ("Even if officers 'created the need to use' deadly force by trying to disarm a mentally ill person, the reasonableness of force depends on the threat the person poses during the shooting."), and the United States Supreme Court recently declined to decide "whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment." *City of Tahlequah v. Bond*, --- S. Ct. ----, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021).[5]

Linda says there is a dispute "whether police have an objectively reasonable basis to presume that any person who is suicidal, or even who may attempt 'suicide by cop,' is a threat to murder other members of the public who he comes across." Mem. Opp'n at

---

[5]     This is not to suggest a conclusion has been reached here that the officers' conduct was "reckless,"; the question need not be and is not decided here.

23–24.  Linda asserts that "this factual dispute is significant, as it is the entire basis of Defendants' contention that they had to kill Mr. Lewis before he killed someone in the public." *Id.* at 24.  There is no evidence that the officers presumed this proposition, and Stoler does not contend that he had to kill Jamie merely because he was suicidal or perhaps attempting to provoke an encounter with police.

Linda says there is a dispute over whether Jamie intended harm to others beyond himself and police.  *Id.* at 25.  On the facts presented, whether Jamie intended harm is not relevant.  *See Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (even if seized person's motive was innocent, officers on the scene could have reasonably interpreted his actions otherwise and responded with force); *Molina-Gomes v. Welinski*, No. 09-cv-3707 (JRT/JJK), 2011 WL 13187418, at *5 (D. Minn. May 25, 2011) ("Courts assessing the actions of officers prior to the use of deadly force, however, have concluded that the state of mind of the suspect is usually irrelevant to the issue of qualified immunity.") (collecting cases), *aff'd*, 676 F.3d 1149 (8th Cir. 2012).  This also focuses on the wrong time, since, as described by Linda, the disputed fact is whether Jamie would have hurt someone in the time before officers found him.  *See* Mem. Opp'n at 25–26.  The critical time was when Stoler believed Jamie pointed a gun at him.  *See McElree v. City of Cedar Rapids*, 983 F.3d 1009, 1017 (8th Cir. 2020) (quoting *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772 (8th Cir. 2014)) ("[W]e need not resolve whether Garringer's mistaken belief [that Gossman fired his gun] was reasonable here since deadly force was authorized because Gossman pulled a gun and thus the officers were 'faced with an apparently loaded weapon.'").

Linda says there is a dispute of fact whether Jamie was holding a gun when he was

shot. Mem. Opp'n at 26. Linda acknowledges that "this dispute standing alone is not dispositive, since an officer's reasonable but mistaken belief that a person was armed will not be subjected to '20/20 hindsight.'" *Id.* Linda says that this fact is nonetheless relevant because "Defendants' repeated assertions that Mr. Lewis was armed and dangerous are significantly undermined if he was concentrating, not on a gun in his hand, but on a beer he was consuming." *Id.* This is unpersuasive, as it is exactly the kind of "mistaken belief" that need not be resolved, *see McElree*, 983 F.3d at 1017, since the pertinent question is what Stoler knew and believed to be the circumstances when he fired. The evidence shows that Stoler thought Jamie had a gun, and there is no evidence to the contrary—that is, there is no evidence that Stoler thought Jamie did not have a gun or even that Stoler was not sure what Jamie had. Linda next says, "Police officers who are convinced that a suicidal person poses a threat to themselves and others are more likely to see what they expect to see when they view a suspect. When they view a suspect unreasonably as a threat, they may be more inclined to mistakenly believe" that the suspect is holding a gun instead of another cylindrical object. Mem. Opp'n at 26–27. Linda cites no evidence for this proposition. Linda goes on to point to cases where the person seized was not a threat, *id.* at 28 (citing *Ludwig v. Anderson*, 54 F.3d 465, 471–72 (8th Cir. 1995), and *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996)), but that is not a persuasive argument where an officer believed a gun was being pointed at him.

Last, Linda says there is a dispute regarding whether Jamie had committed a violent felony or was attempting to flee. Mem. Opp'n at 29. It is not clear that Defendants contend that Jamie committed a felony, that he was intent on committing one, or that he intended

15

to flee.  Either way, this again ignores the circumstances present when Stoler fired at Jamie: the critical circumstances were not that officers believed Jamie was trying to flee or even that he would harm others he might later encounter, but that Jamie was pointing a loaded gun at officers.

Even if Jamie's Fourth Amendment right to be free from an unreasonable seizure had been violated, the right was not clearly established.  The Eighth Circuit recently articulated the standard for the question of whether the right was "clearly established" in *Kong*, which also addressed a 2016 fatal shooting by Burnsville police:

> For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  The law must provide "fair warning" to officials that conduct is unconstitutional. *Tolan*, 472 U.S. at 656.  "Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (alteration added), quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).  "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* at 1153.  "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*, quoting *Plumhoff*, 572 U.S. at 778–79.

960 F.3d at 991–92.  The period under consideration in *Kong* is convenient, providing a useful review of Supreme Court and Eighth Circuit case law on the use of deadly force,

though with particular focus on cases involving a person with a knife, rather than a gun. *See id.* at 992–95.

Defendants point to several cases with similar facts in arguing Stoler's belief that the use of deadly force was reasonable was itself reasonable. Mem. Supp. at 27–28. The Supreme Court has not decided whether officers recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment, so there is no clearly established right with respect to such a scenario from that Court. *See City of Tahlequah*, 2021 WL 4822664, at *2 (where Court of Appeals held that a jury could conclude officers recklessly created the situation that led to a fatal shooting, such that their ultimate use of deadly force was unconstitutional, reversing, not deciding whether officers violated the Fourth Amendment, and concluding that fatal shooting of hammer-wielding man in a garage did not violate any clearly established right). And as previously noted, cases in the Eighth Circuit that discuss the reasonableness of police creating a situation in which deadly force becomes justified come out contrary to Linda's position.

More to the point here, Linda does not identify a case that provided "fair warning" to officers that deadly force under the circumstances here was unreasonable. She first cites *Ludwig*, 54 F.3d 465. Mem. Opp'n at 30. Ludwig had a knife, may have been running away from bystanders who were some distance away, and was assumed to have not physically threatened a police officer. *Ludwig*, 54 F.3d at 473–74. This case is different. Jamie threatened police officers by pointing a gun at them, a key difference that makes this case more like various others in which police were threatened and entitled to qualified immunity for the use of deadly force. *See, e.g.*, *Partlow v. Stadler*, 774 F.3d 497, 502–03

17

(8th Cir. 2014).  Linda next cites *Brower*.  Mem. Opp'n at 30.  But, as discussed above, *Brower* decided only whether a seizure for Fourth Amendment purposes had been sufficiently alleged.  489 U.S. at 599–600.  Even Linda's articulation recognizes that *Brower* did not provide officers fair notice, saying that the case put officers on notice that the seizure "may be unreasonable."  Mem. Opp'n at 30.  Where a right must be clearly established, that is not enough.

Consider next Linda's official-capacity claim against Stoler—which is really against Burnsville, *see Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) ("[A] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent.") (citation and quotation marks omitted)—and her claim against Burnsville.  "A Section 1983 claim against a municipality cannot be based on vicarious liability.  But a municipality may be subject to Section 1983 liability if either the inadequate training of its employees, a municipal policy, or an unofficial municipal custom causes a constitutional injury."  *Ash v. City of Duluth*, 331 F. Supp. 3d 935, 940 (D. Minn. 2018) (citations omitted).  Linda seems to argue only that officers violated some Burnsville policies when they searched for and shot Jamie.  *See* Mem. Opp'n at 31–33.  That is not enough to support this claim.  *See Fuller v. Hafoka*, No. 19-CV-0886 (PJS/BRT), 2021 WL 3036907, at *8 (D. Minn. July 19, 2021) (quoting *Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016)) ("Fuller argues that the defendant officers violated the policy, and that it was their violation of the policy that caused his injury.  As the Eighth Circuit has explained: 'We cannot see how officials' deviation from established policy itself constitutes official municipal policy.  If it did, the concept of official municipal policy

18

would be turned on its head.'"), *appeals filed*, No. 21-2854 (8th Cir. Aug. 19, 2021), No. 21-2886 (8th Cir. Aug 23, 2021).  Linda makes no argument with respect to training, nor any argument at all in response to Defendants' contention that she has not alleged an official capacity claim.  *See* Mem. Supp. at 26 n.6.

B

In addition to the § 1983 claim, Linda has brought two negligence claims.  The first, Count III, is against the City, Stoler, and Levin and based on a breach of their "duty under both written and unwritten policies of the City of Burnsville Police Department to exercise restraint when dealing with individuals in the midst of a mental health crisis," with the City being "vicariously liable for the negligence of [the] individual officers."  Compl. ¶¶ 66–70. The second, Count IV, is against the City based on a breach of its "duty to train its police officers to follow the City's policies as laid out in Count III above, and to train its police officers how to respond to mental health crises without violating the Fourth and Fourteenth Amendment rights of citizens."  *Id.* ¶¶ 72–74.  Both claims will be dismissed.

Defendants argue that the negligence claim based on their alleged duties under policies regarding responding to individuals having mental health crises is barred by official immunity.  Mem. Supp. at 33–36.  "As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion."  *Heard v. City of Red Wing*, 393 F. Supp. 3d 785, 792 (D. Minn. 2019) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)); *see also Ward v. Olson*, 939 F. Supp. 2d 956, 964 (D.

19

Minn. 2013) (quoting *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001)).  If so, an official is entitled to official immunity "unless the official committed a willful or malicious wrong."  *Heard*, 393 F. Supp. 3d at 792 (citing *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992)).

The first step then is to determine whether the individual officers here were "charged by law with duties that require the exercise of judgment or discretion."  Defendants say they were, Mem. Supp. at 34–36, and Linda says they weren't, calling the relevant Burnsville policy provisions "mandatory," Mem. Opp'n at 31.  (Linda makes no distinction between Stoler and Levin in any of her arguments regarding negligence.)  Linda's argument fails, and it is instead appropriate to conclude here the officers were performing discretionary duties, for two reasons.

First, as a general matter, "police officers are classified as discretionary officers entitled to that immunity."  *Ward*, 939 F. Supp. 2d at 964 (quoting *Johnson*, 453 N.W.2d at 42); *see also Yang v. City of Brooklyn Park*, 194 F. Supp. 3d 865, 874 (D. Minn. 2016) (quoting *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006)) ("Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice."); *Kong*, 960 F.3d at 995 (where parties agreed officers' conduct was discretionary, citing cases concluding that "[u]nder Minnesota law, the decision to use deadly force is a discretionary decision").  Second, the only thing Linda relies on in arguing to the contrary is language in various policies, Mem. Opp'n at 31–32, but the policies themselves refer to the need to use discretion, are presented as "guidelines" and use non-mandatory language.  *See* Hruby Decl. Ex. 23 [ECF No. 85-11] § 423.1 ("This

policy provides guidelines for interacting with those who may be experiencing a mental health or emotional crisis. . . . It often requires an officer to make difficult judgments . . . ."); *id.* §§ 423.3, 423.4, 423.6 (describing what officers "should" do); Hruby Decl. Ex. 24 [ECF No. 85-11] § 300.1 ("This policy provides guidelines on the reasonable use of force.); *id.* § 300.3 ("Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident."). The one provision with mandatory language, highlighted by Linda, Mem. Opp'n at 32, is that a Crisis Intervention Team member "shall" be the lead officer, but this provision begins, "Upon arrival . . . ," and no Team member arrived. *See* Hruby Decl. Ex. 23 § 423.5. The policies therefore reinforce, rather than undermine, the conclusion that the officers' conduct was discretionary. Moreover, in *Kong*, the Eighth Circuit applied official immunity to Burnsville officers subject to these same policies (though the parties in that case agreed the officers' conduct was discretionary). *See* 960 F.3d at 995, 996–97.

Having concluded that Stoler and Levin's conduct was discretionary, they are entitled to official immunity "unless the official committed a willful or malicious wrong." *Heard*, 393 F. Supp. 3d at 792 (citation omitted). "[C]ourts consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited. This contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Id.* (cleaned up) (quoting *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007) (quoting *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571–72

(Minn. 1994))); *see also Grady v. Becker*, 907 F. Supp. 2d 975, 985 (D. Minn. 2012) (quoting *Brown*, 574 F.3d at 500–01 (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991))) ("In the context of official immunity, willful and malicious are synonymous, as malice means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.") (cleaned up). "The determination of whether an officer acted maliciously or willfully is usually a question of fact for the jury." *Ward*, 939 F. Supp. 2d at 964 (citing *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 677 (Minn. 1988)). It is not clear if Linda argues that, assuming Stoler and Levin's conduct was discretionary, they committed a willful or malicious wrong by violating Burnsville policies, as her argument appears to only address the discretionary vs. ministerial question. *See* Mem. Opp'n at 31–33. As Defendants note, Linda has not pleaded a willful or malicious wrong. Mem. Supp. at 36.

To the extent it needs to be decided whether a policy was violated, the best conclusion is that none was. Again, not long ago and in the similar circumstances of *Kong*, the Eighth Circuit looked at what appears to be the same policy and concluded that it had not been violated:

> The policy says, "Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis." The officers acted reasonably when they tried to disarm Kong in his car to prevent him from harming himself or others. *See Reuter v. City of New Hope*, 449 N.W.2d 745, 748, 750 (Minn. Ct. App. 1990) (granting official immunity to officers who tried to forcibly remove woman from car and restrain her because her erratic behavior convinced them she would harm herself or her children). A reasonable officer would have believed deadly force was necessary to stop Kong from endangering bystanders

> when he ran through the parking lot with a large knife. *See Hassan*, 489 F.3d at 920 (applying Minnesota law). Therefore, the officers did not violate the policy. *See id.* ("Because the facts establish the officers' use of deadly force was reasonable, a reasonable fact finder could not conclude the officers' conduct was willful or malicious.").

960 F.3d at 996. Similarly, here, the conclusions regarding the § 1983 claim apply to the question of a willful or malicious wrong: Stoler and Levin did not violate a right of Jamie's, and even if they did, they did not violate a known right, and no reasonable fact-finder could conclude otherwise. So, even if Linda's argument is interpreted as being directed at the question of whether the officers' conduct was willful or malicious (and if the fact that Linda didn't allege anything on this point is set aside), the argument fails, and Stoler and Levin are entitled to official immunity.

Linda's allegation of the City's vicarious liability for negligence therefore also fails. *See* Compl. ¶ 70. (She made no argument on vicarious liability. *See* Mem. Opp'n at 31–33.) The Eighth Circuit's decision in *Kong* again says all that needs to be said:

> The City of Burnsville is thus entitled to vicarious official immunity. "Vicarious official immunity is usually applied where officials' performance would be hindered as a result of the officials second-guessing themselves when making decisions, in anticipation that their government employer would also sustain liability as a result of their actions." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 508 (Minn. 2006). Failing to grant immunity to the City of Burnsville would create a disincentive for the City to have policies on officers' interactions with persons undergoing a mental health crisis. *See id.* (granting immunity to avoid creating a disincentive for county to create policies on road-grading). *See also Anderson v. Anoka Hennepin Indep. Sch. Dist. 11.*, 678 N.W.2d 651, 664 (Minn. 2004) ("The court applies vicarious official immunity when failure to grant it would focus stifling attention on an official's performance to the serious detriment

of that performance."); *Hayek* [*v. City of St. Paul*, 488 F.3d
1049, 1057 (8th Cir. 2007)] (granting vicarious official
immunity to city for officers' discretionary acts violating
policy on emotionally disturbed persons).

960 F.3d at 997.

Defendants state that there is no cause of action for negligent training under
Minnesota law, and therefore Count IV must be dismissed.  Mem. Supp. at 36–37.  Linda
did not address this claim.  *See generally* Mem. Opp'n at 31–33.  "Minnesota law does not
recognize a claim for negligent training." *Powell v. Staycoff*, No. 17-cv-03018 (ECT/SER),
2019 WL 2524771, at *20 (D. Minn. June 19, 2019) (citing *Burns v. Winroc Corp.*, 565 F.
Supp. 2d 1056, 1068 (D. Minn. 2008)).

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS
ORDERED THAT:**

1. Defendants City of Burnsville, Steven Stoler, and Brett Levin's Motion for
   Summary Judgment [ECF No. 82] is **GRANTED**;

2. Defendants City of Burnsville, Steven Stoler, and Brett Levin's Motion to
   Exclude the Testimony of Dr. John Cronin [ECF No. 91] is **DENIED** as
   moot;

3. Plaintiff Linda Lewis's Motion to Exclude Experts [ECF No. 97] is **DENIED**
   as moot; and

4.      This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 22, 2021          s/ Eric C. Tostrud

Eric C. Tostrud
United States District Court